UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:15cr142 (JAM) |
| | : | |
| v. | : | |
| | : | |
| ROMANE ST. CHRISTOPHER MCKENZIE | : | October 18, 2016 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

For approximately one month in 2014, defendant Romane McKenzie exploited a 15-year-old girl by sexually trafficking her in Connecticut via the Internet.  After meeting the minor ("MV1") at a party, McKenzie provided her with all the tools necessary for prostitution: hotel rooms, a cellular telephone, a laptop, and access to and advertising photographs for Backpage.com. From text messages between the defendant and MV1 and the records from Backpage.com, it is clear that sex with MV1 was advertised on-line and that MV1 did have sex with men in exchange for money.  It is also clear from those records that she depended on the defendant for instruction in so doing as well as for transportation and food.  While MV1 appears to have been involved in prostitution prior to meeting the defendant, the defendant did nothing to stop her downward trajectory.  Rather, he propelled her to new lows by trafficking her on the Internet for sale.

McKenzie pleaded guilty to one count of sex trafficking of a minor, in violation of 18 U.S.C. § 1591, on August 2, 2016.  As part of the plea agreement, the parties agreed that although the recommended Guidelines range was 121 to 151 months of imprisonment, a sentence of the mandatory minimum 120 months of imprisonment would be appropriate in this case.  The United States thus respectfully requests that McKenzie be sentenced to 120 months' imprisonment and a lengthy term of supervised release.

## I.      FACTUAL BACKGROUND[1]

### A.      *The Arrest of the Defendant*

On November 18, 2014, the Connecticut Superior Court for Juvenile Matters in New Britain forwarded via facsimile to the Enfield Police Department ("EPD") a Take Into Custody Order for MV1, a 15-year-old minor girl believed to be working as a prostitute advertised on Backpage.com (hereinafter "Backpage").[2] Specifically, a case worker with the Connecticut Department of Children and Families ("DCF") informed the EPD that MV1 was posted on Backpage in a prostitution advertisement under the tag line "sexy Italian girl" with the alias "Enid." DCF provided the EPD with current photos of MV1.

On November 18, 2014, the EPD matched the description to an advertisement on Backpage in the Hartford area escorts section.  In the advertisement, there were nine pictures of a white female. In most of the pictures, the female was wearing a black top and a leopard print thong. In some of the pictures, the female was wearing handcuffs. The pictures appeared to have been taken in a hotel room. The narrative portion of the advertisement read as follows:

> Hi my name's Enid and I'm 21 years old. I'm young, sexy blonde, athletic, Caucasian/white and ready to make you feel good. Super professional and waiting to give you an experience you'll want to experience all over again ;) Very hygienic, real pictures, good service, call or text me at 8607191290 No Low Baller, don't call if your going to waste my time.

After reviewing this advertisement, which listed the location as Enfield, an EPD detective

---

[1] The facts appearing under this heading are taken from the Pre-Sentence Report, dated September 30, 2016 at paragraphs 7 through 33.

[2] As detailed in the PSR, the website located at http://www.backpage.com is an Internet site consisting of classified advertisements specific to designated geographical areas.  When users post an advertisement, they may designate the area in which the ad should be posted.  In Connecticut, there are four designated geographical sections on Backpage: Hartford, New Haven, Eastern Connecticut, and Northwest Connecticut.  The "adult" section of the website includes such categories as "escorts", "body rubs", "strippers & strip clubs", "dom & fetish", "ts", "male escorts", and adult jobs. The adult section of Backpage, and in particular the escort category, contains advertisements for prostitutes. Thus, Backpage ads are often used as a mechanism for pimps, prostitutes, or those working for pimps, to post advertisements for prostitution.

initiated a text message conversation on November 18, 2014 at approximately 5:19 p.m. to the telephone number listed in the advertisement. During the conversation the other person acknowledged that they were Enid, that they were in Enfield, and asked if the detective was "a cop" or "affliated with the law." The EPD detective asked how much Enid charged for one hour. Enid replied, $250. It was agreed that the detective would pay Enid $250 for one hour's time, during which time he could engage in sexual intercourse with Enid. The specific type of intercourse was not agreed upon, but Enid stated that she would not engage in "anal or bb." "bb" was clarified to mean the detective was required to wear a condom.

Enid initially directed the EPD detective to go to the Motel 6 in Enfield. When the detective was at the Motel 6, Enid instructed him to go to the Red Roof Inn. When the detective arrived at the Red Roof Inn, Enid instructed him to go to room 233. While in the parking lot of the Red Roof Inn, the detective could see the second floor balcony of the hotel and continued to have a text message conversation with Enid while looking at the door to room 233. At that time, the detective could see a black male, later identified as the defendant, walking on the balcony near room 233. As the detective ascended the stairs to the second floor, he walked directly past McKenzie, who smelled strongly of burnt marijuana. The detective knocked on the door to room 233 and MV1 moved the curtain to look out the window. The detective immediately recognized MV1 from pictures that had been sent to him by DCF. MV1 opened the door and asked the detective if he was a "cop." The detective denied being a police officer and MV1 invited him into the room. A strong odor of burnt marijuana emanated from the room.

Upon entering the room, the detective immediately identified himself as a police officer. From the time that the detective last sent and received a text message from Enid to the time that he entered the room, the detective did not see anyone enter or leave the room. MV1 initially denied

3

her identity as Enid, but eventually admitted that she was the individual wanted by DCF. The detective was also joined in the room by other members of the EPD.

During the time that MV1 was being detained in the room, she stated that she had not committed prostitution, because the $250 was going to be a donation. When asked, MV1 identified McKenzie as "Wookie" to an EPD captain and told the captain that McKenzie had rented the room. MV1 said that she had given McKenzie the money to rent the room and given McKenzie a fifteen-dollar tip for his services. In contrast to these statements, however, there was evidence of trafficking found within the room, such as an unopened condom on the night stand, a set of handcuffs (similar to the ones seen in the advertisement pictures) located on the television table/dresser drawers, and two boxes of condoms. There was also evidence that the defendant lived in the room. Specifically, law enforcement officers found an Enfield Pizza Hut receipt for McKenzie and court-related and other papers for McKenzie.

Ultimately, the defendant was arrested for violations of Conn. Stat. 53a-86, Promoting Prostitution First Degree, and Conn. Stat. 53-2l(a)(l), Impairing the Morals of a Child.[3] While McKenzie stated that he was unemployed, he was found to be in possession of $962.00 in cash and a Metro PCS 4G ZTE mobile telephone at the time of his arrest.

While at the EPD, McKenzie waived his *Miranda* rights and spoke to EPD members. McKenzie stated that he had met MV1 while in Hartford approximately three days earlier. He had given her a cellular telephone and rented the room for her because he was trying to be nice to her and help her out. McKenzie denied having taken the pictures of MV1 that were posted in the advertisement, but under additional questioning admitted to those pictures being on his cellular telephone.

---

[3] These charges were ultimately nolled in light of the instant prosecution. Unfortunately, MV1 was also charged with prostitution, possession of marijuana, and possession of alcoholic liquor by a minor.

B.      **Electronic Media Search Results**

A search of the Verizon LG cellphone found in room 233 uncovered multiple (SMS) text messages regarding prostitution dates/rates/hotel information which included the Red Roof Inn, room 233 and also Motel 6, room 228, in Windsor Locks, Connecticut. The phone had the number 860-719-0004 (subscribed to Romaine McKenzie) stored in the Contacts under the name, "Rude". Text messages with number 860-719-0004 arranged appointments with clients, discussed money and specific rates for sexual services. The phone also contained text messages with prospective clients discussing rates, sex acts, time limits, hotel locations, and law enforcement questions.

The following are some of the text messages between the defendant and the three phone numbers used by MV1.  "Outgoing" refers to text sent by the defendant and "incoming" refers to texts sent by MV1.

| Date | Time | In / Out | Content |
|------|------|----------|---------|
| 11/4/2014 | 8:01 PM | Incoming | How much for room |
| 11/4/2014 | 8:02 PM | outgoing | 70 don't pay yet |
| 11/4/2014 | 8:02 PM | Incoming | I know |
| 11/4/2014 | 8:03 PM | Incoming | Hurry back |

| Date | Time | In / Out | Content |
|------|------|----------|---------|
| 11/7/2014 | 12:28 PM | Incoming | Didn't do the call |
| 11/7/2014 | 12:29 PM | Incoming | Don't come back yet tho she doin a call |
| 11/7/2014 | 12:29 PM | outgoing | The I now |
| 11/7/2014 | 12:30 PM | Incoming | Kay my food came yet ? |
| 11/7/2014 | 12:30 PM | outgoing | Y u didn't do it |

| Date | Time | In / Out | Content |
|---|---|---|---|
| 11/7/2014 | 12:31 PM | Incoming | **Becuz I cant fuck with this I only do head and he said for $50 hh I was like nah** |

| Date | Time | In / Out | Content |
|---|---|---|---|
| 11/12/2014 | 12:59 AM | Incoming | **Baby want Me to go get $350** |
| 11/12/2014 | 12:59 AM | outgoing | **Yes** |
| 11/12/2014 | 1:00 AM | Incoming | **OK I need a ride hold on** |
| 11/12/2014 | 1:00 AM | outgoing | **OK** |
| 11/12/2014 | 1:02 AM | Incoming | **Location in Hartford** |
| 11/12/2014 | 1:02 AM | outgoing | **Dam try let they come** |
| 11/12/2014 | 1:03 AM | Incoming | **They say nah** |
| 11/12/2014 | 1:03 AM | outgoing | **Ok fuck it** |

Other electronic evidence further showed the defendant was not only trafficking MV1 and others, but also was interested in sexual images of minors (or those who would purport to be minors) and understood that MV1 was 15 years old.  With respect to trafficking, evidence from the Nextbook computer recovered from the night table in room 223 and from Backpage demonstrated that the defendant paid for Backpage ads on behalf of MV1 and others.  The website history from the defendant's phone also offered evidence of visits to the Motel 6 in Enfield, the Marriott, and Days Inn in Windsor Locks; and searches for food in Enfield. The phone's geolocation data placed the phone at the Motel 6 in Enfield at many points in time. The cellphone contained pictures of U.S. currency.

With respect to the age of MV1, the defendant's cellphone's web history contains evidence of searches for reports of missing 15-year-old girls and multiple visits to Backpage, including activity to (1) open an account, (2) create ads (including for MV1), (3) pay for ads, and (4) view

6

ads. With respect to minor victims generally, the Nextbook also contained other suggestive photographs of other young women who the FBI has not been able to identify as well as downloaded (as opposed to created) pornographic images of women who – at a minimum – are attempting to appear as if they are minors.

### C.    Witness Statement

Unfortunately, MV1 has refused to cooperate in this investigation.  Hence, insight into her relationship with the defendant has come from the forensic evidence above as well from a woman with whom the defendant had frequent communications.  This woman ("the Witness") ultimately met with law enforcement officers.  The Witness, who was living in Enfield, began working in prostitution in July 2014 in Hartford and worked for herself in hotels during which time she came to meet the defendant, known to her as "Rude" or "Rude Boy."  She met him through a friend and began to buy crack from him.  After a few weeks, she found herself at the Travel Inn short on money to rent a room, and reached out to the defendant.  He agreed to rent a room for her. According to the Witness, they were together after that in a "dating" relationship.  While the Witness would post herself, the defendant would sell her crack, and later heroin, at above-market prices that would result in the Witness turning over all of her earnings to the defendant.

According to the Witness, the defendant brought MV1 to the hotel where they worked so that MV1 could be trafficked.  The Witness believed MV1 was young based on the significant teenage acne she had and her immature behavior.  While MV1 wrote her own posts and took her own calls, the Witness explained that both she (the Witness) and the defendant told MV1 how to do things (e.g. when to take the money, how to tell if the customer is not a cop, etc.).  McKenzie typically rented the rooms for MV1 and the Witness, which came out of what they made, and drove them to the different hotels as well as to local pharmacies to buy condoms and beauty supplies.

Furthermore, as he did to the Witness, McKenzie sold crack to MV1.  While at the Motel 6 in Windsor Locks, MV1 had a seizure, presumably due to an overdose.  An ambulance came for MV1, and the Witness decided to leave.  Police records confirm that an ambulance was called to the motel to respond to the incident.

### D.      The Defendant's Own Words

Several prison calls that the defendant placed further evidenced his involvement in the trafficking of MV1.  For example, in one such call with an associate named Alexis, he feigns ignorance of MV1's age to which Alexis replied "you know she a fuckin little as girl, yo." McKenzie then stated that

> the bitch be doing her thing already yo with some other nigga there ya feel me, she been doin her shit, but I guess, I guess the nigga didn't want to fuck with her right, so we picked her up and shit, you know to hit me up for help one day and I be like alright boom what up my nigga, I can make some money with you and shit, no problem, you know what I mean, she ask me for help so the bitch can get 18 bucks so she can go for her ID this and that, but her she can't go home, ..... yeah I give her a phone and everything and I hear her talk to her mom and I says with everything that's going on, you can't tell her nothing.

In response, Alexis then asked, "you gave her a phone so she could call her mom?"  and McKenzie replied, "no, I buy her a phone so she can do the callin and put on everything you know?" Agents believe that this last statement meant that the defendant bought MV1 the phone so that she could use it to communicate with clients.

In yet another call, McKenzie explained to another person that "they charge me with pimpin, promoting prostitution" and explained that "one of the bitches was young as hell, so they got me on that shit too."  He confirmed the same truth in yet another call where he explained that "the feds were tryin to pick my case up cause the bitch was young."  In the same call, the defendant explained that MV1 was not cooperating with the police, explaining that "the bitch holdin it down

and shit, she be written me and shit…."  When the male talking to McKenzie joked about going to a "tellie" (i.e. hotel) party, McKenzie stated, "nah… ain't no tellie parties...I was droppin them hos' man."  The agents believe that the defendant was saying that he was not have a party at hotel, but rather pimping females – such as MV1 – from hotels.

       E.      ***The Continuing Manipulation***

Based on the prison mail between MV1 and the defendant, it appears MV1 believed herself to be in a loving relationship with the defendant, and that he would be given a less significant sentence if she did not cooperate with law enforcement. McKenzie's behavior towards MV1 indicated a knowing effort to take advantage of their relationship to maximize his personal welfare with very little care for MV1's welfare.

For example, in a letter dated December 30, 2014, MV1 wrote the following to the defendant: "this is rude boy pussy 100%! Never again will I give out your pussy and that word to everything I love.  This is all yours ! 100%." In a letter dated January 12, 2015, MV1 wrote: "my birthday is in 23 more days! I can't wait to be my new age (***2 more years til i'm legal***)" [emphasis added] and "I will hold you down til the day they free you" (meaning that she will not cooperate with law enforcement) and "I will be the one you first see when they take those shackles off. Watch! Out of all the bitches who claim you watch who's going to be there."

In response to these letters, the defendant wrote to MV1, saying "I wish I was fucking you right know."  In another letter, the defendant wrote: "I was so happy I see you that day when you call me to come pick you up, I ran to your rescue on some real shit, I know you are young but I want to marry you, I want to be with you forever, I don't care about the past" and "I thank you and pray every night for us to get out of this hell hole, we just make the wrong dission [sic] but god still love us."

Finally, in a letter post-marked September 6, 2016, the defendant yet again reached out to MV1. In the letter, he wrote that he missed her and was always thinking of her. He expressed his desire to be with her, but explained that "this is the hand I was dealt when I decided to play this game. So I have to deal with the consequences." Throughout this letter, the defendant expressed his love for MV1. He also mentioned his upcoming sentencing and the sentence he was facing.

## II.   GUIDELINES CALCULATIONS

The parties and the PSR agree that the following Guidelines calculations apply. The base offense level under U.S.S.G. § 2G1.3(a)(2) is 30. That level is increased by two under U.S.S.G. § 2G1.3(b)(3)(B) because the offense involved use of a computer or an interactive computer service to entice, encourage, offer, or solicit a person to engage in sexual conduct with the minor. The level is further increased by two under U.S.S.G. § 2G1.3(b)(4) because the offense involved the commission of sex act or sexual contact. Three levels are subtracted from the adjusted offense level of 34 for acceptance of responsibility, resulting in a total offense level of 31. The defendant's Criminal History Category is II. A total offense level 31 with a Criminal History Category II yields a Guidelines sentencing range of 121 to 151 months of imprisonment and a fine range of $30,000 to $300,000. The defendant is also subject to a supervised release term of five years to life, and the Government has agreed not to seek a sentence of supervised release of more than ten years.

As noted above, the parties have agreed that a sentence of imprisonment of 120 months is appropriate here and agree not to seek a sentence of more or less than 120 months of imprisonment.

## III.   SENTENCING FACTORS

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection," and then sets forth seven specific considerations:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

  (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B)  to afford adequate deterrence to criminal conduct;

  (C)  to protect the public from further crimes of the defendant; and

  (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)  any pertinent policy statement [issued by the Sentencing Commission];

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In this case, the factors that are the most significant are the nature and circumstances of the offense, the characteristics of the defendant, and the need for the sentence to provide just punishment and adequate deterrence.

### A.  *Seriousness of the Offense & Just Punishment*

Sex trafficking of a minor is a very serious offense that has long-lasting physical and

psychological effects on victims. While McKenzie trafficked MV1 for approximately one month, that trafficking involved advertising MV1 on the Internet, which meant that her exposure to customers was significantly higher than it would otherwise be. Moreover, it is clear that the defendant made money by trafficking MV1 because (1) she asked him if he wanted her to get money by doing jobs, (2) he clearly controlled the expenditure of money – as reflected by his telling her not rent motel rooms, and (3) he had a significant amount of money on his person at the time of his arrest despite having no known lawful employment.

Admittedly, MV1, who has refused to cooperate with law enforcement, was suspected of prostitution prior to meeting McKenzie. But characterizing MV1's actions as a choice made of her own free will is misguided. As the text messages made plain, this was not a confident woman who had control over own body and person. Rather, she was a young girl who looked to the defendant for permission to accept prostitution jobs, rent hotel rooms, or perform sex.

Moreover, it is not uncommon for the significant impact of sex trafficking to be minimized by victims. As one survivor has testified:

> [Survivors] have to understand what happened to them is wrong and that is was not their fault. A lot of times girls feel like it was their choice. And you have to show them that, you know, you were manipulated, you know, that this person does not care about you, and that this is what they are using you for.

Domestic Minor Sex Trafficking: Hearing Before the Subcomm. On Crime, Terrorism, & Homeland Sec. of the H. Comm. on the Judiciary, 111th Cong. 1 (2010) (hereafter "Congressional Hearing") at 20 (Statement of Shaquana, Youth Outreach Worker and Trafficking Survivor). While McKenzie may not have been the first to propose putting MV1 into commercial sex, he exploited her in equal measure. He offered no resistance to trafficking her and took a number of affirmative steps to advance her exploitation. Every one of the "dates" MV1 participated in as a

result of her Backpage advertisement was another victimization in which a teenage girl had sex with a stranger so that someone else could profit. Adding to this victimization, the defendant had his own sexual relationship with MV1, leading her to believe that he loved her and thereby allowing him to easily control her.

The government anticipates that the defendant may argue that the particular facts of his offense are not as severe as some of the examples that Congress mentioned when it passed the Trafficking Victims Protection Act, including situations where victims were beaten, raped, starved, and tortured. Those cases are undoubtedly harsher, which is in part why the Government agreed to recommend the mandatory minimum term of 10 years' imprisonment for McKenzie. That is not to say, however, that McKenzie's actions were in any way excusable: MV1 needed love, guidance and help and instead, she received manipulation, crack cocaine, and exploitation from the defendant.

In short, the seriousness of McKenzie's offense should not be discounted. A ten-year sentence of imprisonment, followed by a lengthy term of supervised release, will serve as just punishment for his offense.

### B.  Nature and Circumstances of the Defendant

The nature and circumstances of the defendant also counsel in favor of a ten-year sentence. The defendant has little appreciation for the seriousness of his actions. In speaking with associates following his arrest and detention, he expressed no remorse or regret. Indeed, if he were truly remorseful, he would have ceased communicating with MV1. Rather, he continued to contact her, continued to manipulate her and in so doing, perpetuated her reluctance to obtain help from social workers and probation officers. The fact that the defendant is utterly unable to grasp the degree to which his actions will have long-term consequences on MV1 is sadly an indication that he is likely

13

to recidivate.

### C.  Adequate Deterrence

A ten-year sentence of imprisonment would also serve the dual goals of specific deterrence and general deterrence.  Prior to meeting MV1 and while MV1 was with him, McKenzie was promoting the prostitution of the Witness, an adult woman.  Moreover, there were images of several other females on McKenzie's digital media, none of whom the government has been able to identify.  Given that MV1 was not the only person whose prostitution McKenzie was promoting, there is a need to specifically deter McKenzie—not only from trafficking minors, but also from exploiting women more generally.  A significant term of supervised release will also ensure that McKenzie refrains from criminal activity after his release from custody.

There is also a need to generally deter individuals who are engaged in the sex trafficking of minors.  As expressed during the 2010 Congressional hearing, the money to be made in child prostitution, when combined with the difficulty of identifying victims and prosecuting these cases, makes the crime attractive:

> First and foremost—from the perspective of the criminal offender—
> the economic gain of child prostitution or trafficking greatly
> outweighs the risks.  There is very low overhead in terms of cost for
> offenders, and the crime is rarely detected because it is difficult for
> law enforcement to identify minors engaged in juvenile prostitution
> or trafficking.

Congressional Hearing at 12 (Statement of Anita Alvarez, State's Attorney, Cook County, Illinois).  Despite concerted efforts of federal and state law enforcement, child sex trafficking remains a scourge, with estimates of 100,000 children currently being trafficked in this country. Congressional Hearing at 3 (Statement of Senator Ron Wyden).  This is no surprise, as traffickers can make upwards of $200,000 a year through just one victim.  *Id.*  Significant sentences of imprisonment may have a deterrent impact on those who are considering engaging in this crime or

who are continuing to engage in it.

IV.    <u>**CONCLUSION**</u>

Based on the information set forth above and in the PSR, the Government respectfully submits that a sentence of 120 months' imprisonment, followed by a lengthy term of supervised release no shorter than five years and no longer than ten years is a fair and just sentence for McKenzie.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/*

VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
Bar Number: PHV 05095
UNITED STATES ATTORNEY'S OFFICE
1000 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
203-696-3000
Vanessa.richards@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2016, a copy of the foregoing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

/s/
VANESSA RICHARDS
ASSISTANT U.S. ATTORNEY

16